```
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF TENNESSEE
                          NASHVILLE DIVISION

LAQUENZA M. LILLY,              )
                               )
         Plaintiff             )
                               )
v.                             )      No. 3:11-0061
                               )      Judge Campbell/Brown
TENNESSEE DEPARTMENT OF        )
CORRECTION, et al.,            )
                               )
         Defendants            )
```

**TO: THE HONORABLE TODD J. CAMPBELL**

### REPORT AND RECOMMENDATION

For the reasons stated below, the Magistrate Judge recommends that, following the evidentiary hearing in this matter on November 13, 2012, the Plaintiff's complaint in this matter (Docket Entry 1) be DISMISSED with prejudice. The Plaintiff has failed to establish his claim by a preponderance of the evidence, and the Defendants are entitled to judgment in their favor.

### BACKGROUND

The Plaintiff is an inmate in the Tennessee Department of Correction ("TDOC") currently housed at the Morgan County Correctional Complex ("MCCC") in Wartburg, Tennessee. The Plaintiff filed this complaint alleging that the Defendants violated his civil rights under 42 U.S.C. §1983 when being held at Turney Center Industrial Complex ("Turney Center") in Only, Tennessee, on November 1, 2010.

The Plaintiff alleges that, on November 1, 2010 at 10:30 am, he requested that Unit Officer Jeremy Rubert call the clinic because he had back pain. (Docket Entry 1). A nurse and Officer Cathy McCarson came to his cell at 11:15 am, but told the Plaintiff that they were out of his medicine. *Id.* The Plaintiff proceeded to yell at the nurse and Officer McCarson. *Id.*

The Plaintiff alleges that he was let out of his cell at 11:45 am to go to a Disciplinary Board Hearing, when he fell to the floor in pain. (Docket Entry 1). After staying on the floor, the Plaintiff alleges that Officer Jeremy Rubert, Officer Cathy McCarson, Officer David Jenkins, and Officer Jamie Walter grabbed him by his arms and legs and carried him back to the cell. *Id.*

The Plaintiff alleges that the four officers who handled him made his earlier back injuries worse. *Id.* Additionally, his injuries resulted in a pain that shoots down his leg that has caused the Plaintiff to suffer from depression. *Id.*

On November 3, 2010, the Plaintiff filed a grievance regarding the incident on November 1, 2010. (Docket Entry 6). The Supervisor's Response to the Plaintiff's grievance (the first level of review) was filed on November 4, 2010. *Id.* This Response stated that the Plaintiff was cursing and kicking his cell door. (Docket Entry 6). Further, the Response describes that the Plaintiff got out of his cell and laid on the floor refusing to move. *Id.* The Response stated that the officers proceeded to take the Plaintiff back to his cell, then call medical to tend to the Plaintiff for

2

the second time. *Id*. Afterwards, the Plaintiff was seen walking around his cell. He carried his property to A pod later that day (Docket Entry 6). The Plaintiff appealed the Supervisor's Response on November 10, 2010. *Id*.

On November 16, 2010, the Inmate Grievance Committee held a hearing regarding the Plaintiff's appeal. The Plaintiff was absent due to being housed in a High Security Area (HSA) in accordance with TDOC Policy 501.01. (Docket Entry 6). After reviewing the Plaintiff's grievance, the Supervisor's Response, and the Plaintiffs testimony, the Committee upheld the Supervisor's Response. (Docket Entry 6). In addition to the Committee hearing, the Warden agreed with the Proposed Response. (The Committee Hearing combined with the Warden Response is the second level of review). On December 1, 2010, the Plaintiff appealed the Warden's Response (the last opportunity to appeal). *Id*. On December 17, 2010, the third level of review took place, and the Assistant Commissioner of Operations signed his concurrence with the Supervisor's Response. *Id*.

On December 20, 2010, the Plaintiff filed his complaint for violation of civil rights under §1983. (Docket Entry 1). The Plaintiff initially sued the Tennessee Department of Correction and the Defendants in their official capacities only (Docket Entry 1), but on December 21, 2010, he filed an amendment to his complaint to include the Defendants in their individual capacities. (Docket Entry 2). In his complaint, filed on December 20, 2010, the

3

Plaintiff did not include the records of appeal for the second or third levels of review. (Docket Entry 1). The Plaintiff supplemented these documents on January, 10, 2011. (Docket Entry 6). In his original complaint, he admits that as of December 16, 2010, he had been notified of the results of the his first appeal (second level of review), but not the result of his second appeal (third level of review). (Docket Entry 1). The third level of review was completed on December 17, 2010, a day after the Plaintiff filed his complaint. (Docket Entry 6).[1]

On April 6, 2011, the Defendants filed a Motion to Dismiss stating that the case should be dismissed without prejudice for failure to exhaust administrative remedies. (Docket Entry 29). Additionally, the Defendants state that they have Eleventh Amendment immunity from suit and are not persons subject to suit under §1983. *Id*. The Plaintiff's Response basically argued the points in his complaint. (Docket Entry 31).

Following initial proceedings in this matter, the Defendants filed a motion to dismiss, which was the subject of a Report and Recommendation (Docket Entry 36), which was subsequently adopted by Judge Campbell (Docket Entry 40). As a result, the Plaintiff's claims under the 11th Amendment against all Defendants,

---

[1] Because the Plaintiff's Complaint was mailed on December 17, 2010, the same day the Assistant Commissioner denied the Plaintiff's third level of review, the Magistrate Judge believes that the Plaintiff did not know of the result of the third level of review at the time he mailed his complaint.

4

in their official capacities, were dismissed. However, the suit against the Defendants in their individual capacities remained.

Neither side filed motions for summary judgment in this matter, and since there was no proper request for a jury trial, the Magistrate Judge scheduled a final evidentiary hearing on the merits of the case. The parties were advised that, following this hearing, the Magistrate Judge would prepare a Report and Recommendation for Judge Campbell as to the final disposition of the case at the District Court level (Docket Entry 79). After a couple of continuances due to scheduling issues, an evidentiary hearing was conducted in this matter on November 13, 2012. The parties stipulated the admissibility of the Plaintiff's medical records (Exhibit D) and the Plaintiff was allowed to call two inmates who were represented to have first-hand knowledge of the November 1, 2010, incident.

## SUMMARY OF THE EVIDENTIARY HEARING[2]

The transcript of the hearing was filed as Docket Entry 124.

The Plaintiff's first witness was **Orlando Ladd**, whose testimony was recorded at Docket Entry 124 at pages 10 through 17.[3]

---

[2]An index of the transcript is attached to this Report and Recommendation.

[3]Unfortunately, the court reporter's page numbering and the ECF docketed information printed over each other. For clarity, the Magistrate Judge will use the page numbers at lower right-hand corner of the transcript.

5

Mr. Ladd testified that on November 1, 2010, he did not see the Defendant cursing or being disrespectful to officers in any manner. He stated that, when he got to his cell, he saw the "Plaintiff on the floor with three officers and a nurse, and that "each of them had a body part and they took you to your room and just like, throwed you, in his room and left you on the floor." The witness stuck with his testimony that it was a nurse and three officers.

On cross-examination, Mr. Ladd admitted that he had been convicted in October 2010 of an assault on an inmate and participating in Security-Threat Group (STG) activity along with the Plaintiff. He also had been convicted of possession of cocaine and Schedule II drugs. On questioning by the Magistrate Judge, the witness testified that he thought the nurse was the one that the Plaintiff had called a bitch earlier in the morning. The witness was unable to identify any of the four Defendants in court or at counsel's table as being the individuals who grabbed or carried the Plaintiff to his cell.

The Plaintiff's next witness was inmate **Carl Talley** (Tr. 17). Mr. Talley testified that he saw the incident that occurred on November 1, 2010, and that he saw the officers the Plaintiff was having a problem with in court (Tr. 17). He stated that he saw the Plaintiff on the floor asking for help and trying to talk to the nurse and that they picked the Plaintiff up and carried him to his cell. He said that he did hear Officer Rubert trying to get the Plaintiff help from the nurse. He did not think that any of the

6

other individuals or the nurse were trying to help the Plaintiff. He thought that the people who picked up the Plaintiff picked him up hard and used a little force (Tr. 17-18).

On cross-examination Mr. Talley admitted that he had been convicted of an assault of an inmate in 2010 along with the Plaintiff (Tr. 19).

On redirect, the witness said that he did not hear any cursing or arguing going on while the Plaintiff was on the floor, and that the Plaintiff was not bodily swinging or moving his arms in any kind of violent manner or anything like that (Tr. 20).

At this point the Plaintiff rested (Tr. 21).

The Defendants then made a Rule 50 motion for judgment as they contended there had been no evidence that any of the Defendants were involved in this matter. Since the Plaintiff was proceeding *pro se*, the Magistrate Judge allowed him to reopen his proof to see if he could identify specific Defendants as having picked him up. On recall, Mr. Talley identified the three male officers at counsel table as being three of the individuals who had picked up the Plaintiff. He stated that he did not see the nurse, who was involved in the incident, present in court (Tr. 23-24).

Following a considerable amount of discussion the Plaintiff was allowed to reopen his case and testify himself (Tr. 31). On direct examination (Tr. 32), **Mr. Lilly** testified that, on November 1, 2010, he had back pain and asked Defendant Officer Rubert to call the nurse. He specifically identified Officer

7

Rubert. He testified that Officer McCarson and the nurse walked by and the nurse told him that she was out of medication and walked off. He testified that, around the time of the first encounter with the nurse, he went to a Disciplinary Board hearing along with Talley and Ladd, who were charged with him in an assault on an inmate on October 10, 2010. He testified that he did not think he had a full hearing at the time he was sent back to his cell. Later in the day his cell door opened and he thought he was going back to the Disciplinary Board and that, when he walked out, his back was hurting and he again asked Officer Rubert to call for help.

At this point he stated that Officers Jenkins, McCarson, and Walters walked up and Officer Rubert stated that he had been asking for the nurse all morning. He identified Officer McCarson as screaming that "That's the one who called me the B word!" Officer Jenkins then stated, "Grab him and pick him up," and the Defendants each grabbed him by one extremity and carried him to his cell and put him down, pretty much slamming him on the concrete (Tr. 36).

He testified that the various officers then wrote him up for creating a disturbance and refusing direct orders to cover up their mistreatment of him (Tr. 38).

On cross-examination (Tr. 40), the Plaintiff stated that he hurt a muscle in his back on September 4, 2010, lifting weights. He admitted that he was removed from a Disciplinary Board hearing on the morning of November 1, 2010 (Tr. 43). He admitted that he

8

had a cell mate in his cell at the time of the incident with the Defendants on November 1st. He admitted that he did not call his cell mate as a witness because he said he did not know his cell mate's name.

He testified that he and the two inmates who testified for him were all convicted of STG activities and assaulting an inmate. He admitted that he had criminal convictions in 2006 for counterfeiting a controlled substance--crack cocaine-- and that he was serving time for a 1997 voluntary manslaughter and aggravated robbery (Tr. 44).

The Plaintiff testified that, before the incident, he was suffering from a muscle strain. After the incident he was diagnosed with a slipped vertebrae, which might not respond to surgery (Tr. 48).

Mr. Lilly referred to a doctor's diagnoses at Page 199 in his medical record, and pointed out that his x-ray report was at Exhibit A, page 30. At this point Mr. Lilly rested his case (Tr. 49-50).

The Defendants then began their presentation with the testimony of Officer **Jack Middleton** (Tr. 50). Officer Middleton is presently a Shift Commander, and was the Disciplinary Board Chairperson at Turney Center in October and November of 2010. He was a 27-year veteran of the Department of Corrections (Tr. 51). He testified about a disciplinary action against the Plaintiff and his two witnesses for assault and participating in a STG activity on

9

October 15, 2010.  This testimony was admitted for a limited purpose to show the potential bias of the Plaintiff and his two testifying witnesses.  The Magistrate Judge indicated that he might limit the weight to be given this matter (Tr. 52-55).

He also testified about the Plaintiff's activities at the disciplinary hearings on November 1, 2010.  At the hearing the Plaintiff was loud, cursing, and threatening and was removed from the hearing because of his behavior (Tr. 55-56).  He recalled that the Plaintiff walked away from the hearing and did not appear to be in any physical discomfort.  After Mr. Lilly was removed from the hearing, he was found guilty of assault and STG activity.

Later the Plaintiff was charged with creating a disturbance by kicking his cell door and calling one of the officers a "fat-assed bitch."  He was also charged with refusing a direct order to return to his cell after it was reported that he left his cell and attempted to return to the Disciplinary Board hearing.  The report alleged that he sat on the floor at the front doorway and stated that he wanted to see a nurse and refused an order to return to his cell.  Following this he was placed in his cell by guards.  Officer Middleton stated that the Plaintiff later pled guilty to both of these charges(Tr. 56-58).

On cross-examination Officer Middleton stated that, to his knowledge in the 14 years of prior incarceration, the Plaintiff did not have any STG material write-ups, nor was he ever suspected of being a member of the vice lords, or any other organization.

10

Officer Middleton stated that the Plaintiff was in a holding cell four cells down from the Disciplinary Board and that they could hear him being disruptive. He admitted that, because the incident was some two years ago, he did not remember any specific words that the Plaintiff used that led to his removal from the Disciplinary Board hearing (Tr. 58-60).

The Plaintiff appealed the conviction for assault and STG activities. The appeal was denied because it was untimely. The Magistrate Judge noted that it only went to the issues of bias and credibility, and that the Magistrate Judge did not consider it particularly important (Tr. 62).[4]

The Plaintiff pled guilty to the charges for the incident on November 1, 2010, as a result of a plea agreement with the Board. He agreed to serve 10 days disciplinary segregation for the disturbance and a 10-day disciplinary segregation sentence, suspended for a 60-day probation period for refusing a direct order (Tr. 63-65).

The Magistrate Judge notes that the actual conduct of the hearing the morning on November 1st where the Plaintiff was excluded did not have much relevance, the real issue being whether excessive force was used in putting him back into his cell later in the day (Tr. 68).

---

[4]For the purpose of this Report and Recommendation the Magistrate Judge has only considered these findings on the issues of bias as it affects credibility.

11

The next defense witness was **Cathy McCarson** who stated that she had been a correctional officer for six years and worked at the Turney Center (Tr. 70). She testified that on November 1, 2010, she was accompanying the nurse who was passing out medication. The Plaintiff asked for the nurse to come to his cell and asked about medications that the doctor had supposedly ordered for him. The nurse told him that she did not have anything and did not see anything that she was supposed to bring. She stated that at the time the Plaintiff appeared to be already agitated from activities earlier in the day, and that he essentially pitched a fit over his lack of medication (Tr. 70-71).

She and the nurse went on to the next pod. When she returned to Delta pod, the Plaintiff was out of his cell. She stated that the Plaintiff was still angry, still yelling, that she told him he had to go back into his cell, and that he could not be out. He stated to her that he was going back to his Disciplinary Board hearing. She told him that the hearing was over, that he knew that, and that he had to return to his cell. She stated that he kept screaming that they were trying to make him go to "max" and that he wanted a "gold badge" to come down (Tr. 71).

When he refused her order to return to his cell she called for Inmate Resource Counselor (IRC) Jenkins. Jenkins was a "gold badge" (a higher ranking officer). She stated that an IRC was the equivalent of a corporal. Her badge was silver.

12

When the Plaintiff heard her radio for IRC Jenkins, he sat down on the floor and said, "I'm not moving. You all can move me." (Tr. 71-72)

The Plaintiff refused IRC Jenkins's order to return to his cell on numerous occasions (Tr. 72). At this point IRC Jenkins radioed for Unit Sergeant Dickson to come[5] (Tr. 73). Sergeant Dickson was the highest ranking officer in the building at the time, and he had removed the Plaintiff from the Disciplinary Board hearing earlier in the day.

The Plaintiff continued to complain about the nurse "messing" with his medication, that he wanted the nurse down there because they were going to give him his meds, and that they were all just trying to make him go to "max." As a result of this, Sergeant Dickson made the call to have him picked up and moved back to his cell (Tr. 73). She stated that Sergeant Dickson, IRC Jenkins, Jimmy Walters, and Jimmy Rubert did pick him up and carry him to his cell. She opened the cell door and walked in with him, and when the other officers set him down, she backed out of the cell and closed the door. Because they had used force, medical was immediately called and a nurse came down to check the Plaintiff. McCarson did not touch the Plaintiff at any time and she did not see any undue force used upon him (Tr. 74).

---

[5]It appears Dickson was promoted to Lieutenant just before November 1, 2010, and he is referred to as both Sergeant and Lieutenant in the transcript (Tr. 151).

13

On cross-examination she stated that she was the pod officer for that day, and that she was in and out of the pod quite a few times that day. She did not specifically recall telling IRC Jenkins that the Plaintiff had called her the "B-word." She said that IRC Jenkins was well aware that the Plaintiff had created several disturbances that day (Tr. 78). She did not prepare the write-up for two hours because she had been busy with other things (Tr. 79). She specifically denied putting her hands on the Plaintiff (Tr. 79-80).

The next witness for the Defendants was **James Walters** (Tr. 81), a 15-year correctional officer with TDOC. On November 1, 2010, he received a call from Officer McCarson and that, when he arrived in Delta pod, Officer McCarson, IRC Jenkins, and Officer Rubert were there and the Plaintiff was sitting on the floor. He heard IRC Jenkins giving numerous orders for the Plaintiff to return to his cell. The Plaintiff refused, saying he wanted to talk to somebody, that he wanted to see someone from medical because of his medications, and that he was not going to go anywhere. At this point Sergeant Dickson came in, and Sergeant Dickson gave him similar orders. Sergeant Dickson then directed them to place the Plaintiff back in his cell (Tr. 81-82). He, IRC Jenkins, Officer Rubert, and Sergeant Dickson picked the Plaintiff up and carried him to the cell. Officer McCarson opened the cell door, they stepped in and set the Plaintiff on the floor. The Plaintiff was not struggling, and they used as little force as

14

possible.  He never saw Officer McCarson touch the Defendant in any way (Tr. 82).

Officer Walters stated that, because of major stomach surgeries, he was not in good physical condition and he would not have been able to swing an inmate without injuring himself.  At the time of this incident The Plaintiff's cell mate was in the cell and sitting on the bottom bunk (Tr. 82-83).

The Plaintiff, as a result of the Disciplinary Board earlier that day, had been recommended for maximum security and involuntary administrative segregation (Tr. 83-84).  As a result of maximum security and involuntary segregation, inmates are supposed to be in restraints whenever they are out of their cell.  The Plaintiff was out of his cell because his door had accidentally opened and he was in the pod without restraints.  They could not leave him out of his cell for security reasons, and he believed that is one of the reasons that the decision was made to place him back into his cell (Tr. 84).

Officer Walters identified a surveillance tape showing the Plaintiff being transferred from one area to another while carrying his property on February 16, 2011.  This tape was admitted for the purpose of showing that the Plaintiff appeared to be able to move without discomfort at that time (Tr. 85-87).  As the tape was being viewed, Officer Walter testified that the officers had offered to carry the Plaintiff's property but he refused.  The tape

15

did show that he was in full restraints with chains on his arms and legs (Tr. 88).[6]

The Plaintiff made a statement that, having seen the tape, he did recall that he was carrying underwear, but that toward the end his back began to hurt and they carried some "stuff" for him at the end (Tr. 89-90).

On cross-examination Officer Walters stated that, when he first saw the Defendant he was sitting on his buttocks and that, after Sergeant Dickson came, in he lay down fully. The Defendant was not struggling and they carried him straight into this cell and put him on the floor. The Plaintiff had a top bunk and his cell mate was sitting on the bottom bunk. The floor was the only place to put him (Tr. 91-92).

Because of his surgeries, he knew what pain was and that he thought that placing the Plaintiff on the floor was the gentlest place they could have placed him (Tr. 93).

The next witness was **Corporal Jeremy Rubert.** He testified that he had been with TDOC for five years and was assigned to the Turney Center (Tr. 94). On November 1, 2010, he was helping Sergeant Dickson run the Disciplinary Board proceedings. He was taking inmates from their cells to the Board and then returning them to their cells. On this particular day, around 1:00 pm, he heard a door open and noted that the Plaintiff was walking out of his cell. He asked Officer McCarson if the

---

[6]The tape was admitted on the issue of damages.

Plaintiff was supposed to be out of his cell. They knew that he had already been disruptive at the Disciplinary Board and she told the Plaintiff that he needed to return to his cell. The Plaintiff stated that he was not going to his cell, that he was going to the Disciplinary Board. He refused to return to his cell and stated that he was not going anywhere until he saw a "gold badge." IRC Jenkins responded to the area and the Plaintiff essentially told IRC Jenkins the same thing and then sat down (Tr. 94-95). He refused the order of IRC Jenkins to return to his cell and stated that he was not going anywhere until he saw a nurse or a "gold badge." At this point they called Sergeant Dickson and the Plaintiff stated to Sergeant Dickson that he was not going anywhere.

Sergeant Dickson advised him that he needed to go to his cell or they were going to put him in his cell. At this point the Plaintiff lay down on the floor with his arms up, and said "I'm not going anywhere." The Plaintiff was not combative, but he had been recommended for maximum security so they felt they had to move him so they could continue with escorting other inmates to and from Disciplinary Board proceedings (Tr. 96). At this point he, Walters, McCarson and Dickson, picked the Plaintiff up. He initially said McCarson picked him up, but immediately corrected himself to say that she did not pick him up. She opened the door and closed it after they had put the Plaintiff in his cell. Officer McCarson did not touch the Plaintiff. When he first saw

17

the Plaintiff come out of his cell, he was walking normally and did not display any problems (Tr. 96-97).

Later, after the Plaintiff and inmate Ladd were transferred to other cells, they were both housed in Alpha pod where Ladd was housed directly above the Plaintiff. On one occasion, he heard the Plaintiff and Ladd having a conversation about a lawsuit and that the Plaintiff stated if Ladd would help him, he would help Ladd when he got his settlement (Tr. 98).

On cross-examination, Officer Rubert said that, although IRC Jenkins was a "gold badge," the Plaintiff insisted on talking to the highest ranking "gold badge" available (Tr. 100). He did not recall the Defendant asking for specific medical help, only that he wanted to see medical (Tr. 101).

He agreed that a single person trying to pick up a 200 pound inmate could hurt himself. He said that inmates can report a medical emergency to officers, but it is up to the officer to determine whether there is a true emergency and to call a CODE, or to secure the situation and then notify medical (Tr. 102-3).

Officer Rubert said that if he saw someone bleeding excessively or hunched over looking like they were in pain, he would normally notify medical to come immediately. If not, he would call them over the telephone and they would determine when they would come. He did not recall specifically the Plaintiff saying anything about getting a nurse or seeing a nurse (Tr. 103).

18

The next witness was **IRC David Jenkins.** He stated that he had worked at the Turney Center since 2001. An IRC has duties in both security and in "treatment." He counsels inmates, works with reclassification, and sits on the Protective Custody Board, Disciplinary Board, and the Grievance Board (Tr. 105-6). He testified that on November 1, 2010, he received a call from Officer McCarson to come to Delta pod. He came to Delta pod along with Officer Walters, and he saw the Plaintiff sitting on the floor about six to eight feet inside the pod door. He was sitting on the pod floor leaning against the wall and refusing to go back into his cell.

When he asked him what the problem was, the Plaintiff stated that he wanted to go to the Disciplinary Board. IRC Jenkins knew that the Plaintiff had been removed from the Disciplinary Board hearing, and so he told the Plaintiff that the hearing was over. The Plaintiff then said he wanted to see a nurse. He told the Plaintiff to go back to his cell, that they could get a nurse up there. He said that he had already heard that the Plaintiff had been complaining with the nursing staff over getting his medications. He said that they found out later that the order for the medication had expired and it would not be renewed (Tr. 106-7).

After the Plaintiff refused his orders to return to the cell, he called for his supervisor, Sergeant Dickson. When Sergeant Dickson arrived, he repeated the orders for the Plaintiff to go to his cell two or three times. However, the Plaintiff just

19

lay on the floor and said he was not going.  The Plaintiff was specifically told that if he did not go in they were going to have to put him in, and he still refused.

As IRC Jenkins recalled he, Defendants Walters, Rubert and Dickson each grabbed a limb and carried him to his cell door. Officer McCarson opened the door and they went inside and set him down on the floor, and after they backed out McCarson locked the door.  They completed an incident report on the matter, and since it involved a use of force, they called the nursing staff.  He did not recall Officer McCarson touching the Plaintiff at all.  He thought that the Plaintiff was some 15 to 20 feet from his cell door when he saw him sitting on the floor (Tr. 107-8).  He had seen the Plaintiff walking earlier in the day and he appeared to be okay (Tr. 109).

On cross-examination he reiterated that the first thing the Plaintiff said was that he was going to the Disciplinary Board, but when the Plaintiff was told the Disciplinary Board was over with, he lay on the floor and said he wanted to see medical.  He was clear that the Plaintiff did not ask about medical until after he was told he was not going back to the Disciplinary Board (Tr. 109-10).  He agreed that some officers would stick together in a tight brotherly group.  He did pick the Plaintiff up, but he insisted that they did not throw him on the floor.  He said he did not consider that they had a medical issue until they had to use force to place the Plaintiff in the cell.  Once they did that, they

20

called medical to evaluate him, because that was part of their policy on use of force (Tr. 110-11).

The next witness was **Corporal Kory Godwin**, a correctional officer assigned to Unit V on November 1, 2010.

After the incident where the Plaintiff was placed back in his cell, he escorted the Plaintiff to maximum security. At this time the Plaintiff did not show any signs of being in any physical pain, and he did not appear agitated at this time. The Plaintiff was talkative and on the way out he was talking to different inmates in the pod, and even made a joke about laying down on the floor. On cross-examination, he said that the Plaintiff did not use a push cart to move his property. He did not personally go through the Plaintiff's property and did not know how much it weighed. He insisted that the Plaintiff did not complain to him about a back problem or needing help moving his property. He also denied hearing any of the inmates telling him to assist the Plaintiff.

In response to questions by the Magistrate Judge, Corporal Godwin said that the Plaintiff placed his property in garbage bags and carried them out of his cell into an office area, and from there he was escorted to a cell. He admitted that what the Plaintiff carried in garbage bags could not have been too heavy (Tr. 115-6).

The next witness for the Defendants was **LPN Barbara Breeden** (Tr. 117). She stated that she was making her afternoon

med pass in the high security area, and the Plaintiff asked about his meds. She told him that they were out of his specified medication at that time. She stated that he got mad and screamed at them when he was told that she did not have his medications. She did not recall whether he kicked at his door or not.

She testified that she did attend to the Plaintiff after he was carried back to his cell. She looked at a copy of the accident incident traumatic injury report and advised that she prepared it. As part of her assessment she noted that the Plaintiff walked from his bed to his cell door and that she was able to see how he moved. She did not notice any problems with his movements (Tr. 118-19, Ex. 10). The date 11-09 on her report was the date her supervisor checked it. She insisted that she wrote it on the day that it happened (Tr. 120).

The Plaintiff showed her an MRI report dated December 29, 2010 (Ex. D), which appeared to show some back problems. She testified that this was beyond the scope of her training and she could not say whether the MRI report related to the November 1st incident or not (Tr. 121-22).

When questioned by the Magistrate Judge she stated that the pharmacy was out of his prescribed pain medication. She did see him a third time that day and gave him Ibuprofen 200 (Tr. 124).

The next witness for the Defendants was **LPN Jessica Blankenship** (Tr. 126). She examined the Plaintiff on November 2, 2010 (Tr. 126, Med. Records p. 197, Ex. 11).

At that time he told her that his back was killing him, and that he rated his pain level as 10 on a scale of 10. However, she noted at the time that he was smiling and joking with her and that his blood pressure was 128/88. She considered this to be in the normal range. She testified that normal blood pressure would indicate a lack of pain. When an individual is in pain, normally the blood pressure will go up and that the pulse and respiration rate also will increase (Tr. 127).

She also testified that when someone complains of back pain they usually examine the back to see if they could locate a problem. She did not see any signs of muscular problems when she did that check. She stated that she did refer him to their physician's assistant to evaluate him in more depth (Tr. 128).

The next witness was **Dr. Otis Campbell** (Tr. 128). Dr. Campbell is the Medical Director for Turney Center where he has worked for the past six years. He had treated the Plaintiff and had personal knowledge of his physical condition (Tr. 129). Testifying from the Plaintiff's medical records, Dr. Campbell stated that the Plaintiff hurt his back lifting weights (Ex. A, p. 303), and that he did have an x-ray of his lumbar spine on September 9, 2010, which was normal (Ex. A, p. 30).

The records reflected that the Plaintiff said that he was lifting 135 pounds when he felt something tighten up and felt like he was going to pass out. He was complaining of pain to his lower back and thighs. The records reflect that the Plaintiff refused

medical service and signed this as being against medical advice on September 4, 2010 (Ex. A, p. 203). He was apparently admitted to the infirmary and given ice to the back (Tr. 132). He was placed on the limited activity notice on September 9 through 12, 2010 (Ex. A, p. 304). The Plaintiff complained again of severe pain on September 7, 2010, and complained that he could hardly walk (Tr. 133) (Ex. A, p. 202). The records reflect that the Plaintiff was crying upon walking into the clinic (Tr. 134). There were additional progress reports on September 16th that the Plaintiff was still having back pains on September 27th, but the back pain was better and that he was able to move better (Ex. A, pp. 199).

On October 28, 2010, there was a progress note that he was complaining of back pain again, complaining that he had thrown "his back out again." (Ex. A, p. 198) At this time Dr. Campbell noted a decrease in range of motion in the back and positive tenderness over the lower thoracic spine. The assessment was made that the Plaintiff suffered from a muscle strain (Tr. 135). It appears that Dr. Campbell again saw the Plaintiff on November 23, 2010.

> Subjective complaints of persistent low back pain with radiation down the left leg with little response to fioricet, baclofen, zicodin, incodcin, initially injured back when weight lifting 135 pounds on September 2010, pain worsening with onset of pain radiating down left leg.

(Tr. 135-6) (Ex. A, p. 195).

24

As a result of this complaint, Dr. Campbell requested that the Plaintiff be sent for an MRI (Tr. 136). The Plaintiff received an MRI of the lumbar spine on December 22, 2010, which showed disc bulges at the L3-L4 and L4-L5 regions (Tr. 137) (Ex. A, p. 189-90, 252). A neurosurgical consult was requested for the Plaintiff on December 30, 2010 (Ex. A, p. 246). Because of a diagnosis of a herniated disc with nerve root compression at L3-L4, and L4-L5, the neurosurgeon recommended medication and physical therapy, but not surgery at that time (Tr. 139) (Ex. A, pp. 238-39).

Dr. Campbell said that this September incident could have been muscle or tendon spasms, or it could possibly have been a herniated disc. Complaints of pain radiating into his thigh could also be potential indications of a herniated disc.

Dr. Campbell could not say with a reasonable degree of medical certainty whether the November 1st incident caused his current back condition. The Plaintiff had an injury prior to that, and whether the November 1st incident aggravated that or caused new injury, no one could know for sure. Pain is a subjective issue and is extremely difficult to evaluate. Patients with back problems can have good days and bad days (Tr. 140-1).

On cross-examination, Dr. Campbell stated that he had no difficulty when the Plaintiff came to the clinic, his behavior was satisfactory (Tr. 141-2). Dr. Campbell did recall a 30-minute conversation with the Plaintiff in September when he pointed out to

25

the Plaintiff where he could feel a knot in his back and prescribed muscle relaxants for him. He diagnosed the problem as a muscle strain in September. The neurosurgeon advised that they might have to revisit the option of surgery if medication and therapy were not successful (Tr. 144).

The Magistrate Judge asked whether an x-ray would show the same type of back problems as an MRI. Dr. Campbell said the x-ray would not show the same details an MRI would show. The x-ray was mostly limited to bones and not soft tissue.

In further response to the Magistrate Judge's questions, Dr. Campbell said that the Plaintiff did complain to him that the incident with the guards had re-injured his back. After some searching through the records he indicated that the first time he would have heard about the November 1 incident would have been on November 23[7] when he requested the MRI.[7] The reason for the MRI request was because the Plaintiff was reporting additional symptoms of pain radiating into the leg. He did see some additional problems when he saw the Plaintiff on November 23rd (Tr. 146-8, 150).

The next witness for the Defendants was **Lieutenant Jerry Dickson**, a 26-year TDOC employee. He was promoted from Sergeant to Lieutenant just before November 1, 2010 (Tr. 151). He escorted the Plaintiff to and from the Disciplinary Hearing regarding the STG

---

[7]The medical records show the MRI request was dated November 24, 2010 (Ex. A, p. 253).

26

activity. At that time the Plaintiff seemed to be walking fine (Tr. 151-2). The Disciplinary Board Chairman, Sergeant Middleton, had the Plaintiff removed from the hearing because of his loud and argumentative behavior (Tr. 152).

He was called when the Plaintiff refused to return to his cell. He directed the officers to pick the Plaintiff up by his arms and legs and carry him into his cell (Tr. 152). Officer McCarson did not touch the Plaintiff (Tr. 153).

On cross-examination Lieutenant Dickson did not recall the Plaintiff saying anything about needing medical help. He recalled the Plaintiff refusing to get up (Tr. 155). In addition, he said that inmates did have to pay $3 for regular sick call and $5 for emergency sick calls (Tr. 156). However, he was clear that he did not recall the Plaintiff saying anything about needing a sick call.

### ARGUMENTS OF THE PARTIES

The Plaintiff in argument contended that the evidence showed that he had a right to request emergency medical help and that the officers used excessive force in picking him up and carrying him to his cell. He was not given appropriate treatment after this. He contended that the nurses coming to see him and looking at him through the cell door was not an appropriate response after the use of force and, that they remained deliberately indifferent to his serious medical problem.

27

The Defendants argued that the Plaintiff was out of control all day long, right from the time when he was brought to the Disciplinary Hearing and had to be removed from the hearing because of his belligerent behavior. He continued to be belligerent when a nurse came around and did not have his medication by kicking on the door and creating a ruckus in the high security area where everyone was on lock down. His cell door was opened by mistake and he refused to go back to his cell. His testimony that he was refusing to go back because of a medical emergency was bogus. He was not having any problems walking. He had no reason why he could not have obeyed the various officers' orders to go back to his cell. It was only after repeated refusals to return to this cell that he was physically carried there.

The Defendants contend that, although the records show he had an existing back injury, there is no medical proof to show that the act of being picked up on November 1st aggravated the injury, but in any case, the force used was reasonable and the Plaintiff was responsible for any aggravation because of his refusal to obey orders to return to his cell.

## LEGAL DISCUSSION

The Plaintiff has set forth a claim for violation § 1983 alleging excessive force by four prison guards. He further alleges that they were deliberately indifferent to his serious medical needs. Unlike many cases of excessive force, this case is not being decided on a motion for summary judgment and, accordingly,

28

the Court may weigh the credibility of the witnesses and weigh the evidence in arriving at a decision.

In making this recommendation the Magistrate Judge has considered the testimony he heard during the hearing on November 13, 2012, and the various exhibits admitted during that hearing.

Section 1983 prohibits a person "acting under color of state law" from depriving an individual "of a right secured by the Federal Constitutional laws of the United States." *Wolotsky v. Haun*, 960 F.2d 1331, 1335 (6th Cir. 1992). Prisoners are protected from the use of excessive force by the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312 (1986). In this case the record shows that the Defendant is a prisoner and not a pretrial detainee. Therefore, the Eighth Amendment, rather than the Fourteenth Amendment is applicable. In determining whether a use of force violates the Eighth Amendment, the Court must determine if the Defendants' conduct caused "unnecessary and wanton infliction of pain." *Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir. 1993). As the Sixth Circuit pointed out in the recent case of *Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010),

> To ascertain whether excessive force was used under the Eighth Amendment, the Court must determine whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically to cause harm. Such a claim has both an objective and subjective component. The objective component requires that the pain be serious. The subjective component requires that the offending non-penal conduct be wanton.

29

A deliberate indifference claim also has both objective and subjective components, *see Moore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004). The objective component requires the Plaintiff to show that the medical need at issue is sufficiently serious, and the subjective component requires a showing that the prison officials have a sufficiently culpable state of mind in denying medical care. *Alspaugh v. McConnell*, 643 F.3d 162 (6th Cir. 2011).

In *Alspaugh,* the Court pointed out that, in evaluating deliberate indifference claims, the court must distinguish between cases where the complaint alleges a complete denial of medical care, and those cases where the claim is that the prisoner received inadequate medical treatment. Where a prisoner alleges only that the medical care he received was inadequate, federal courts are generally reluctant to second-guess medical judgments. However, it is possible for medical treatment to be so woefully inadequate as to amount to no treatment at all. *Id.* at 169 (*quoting Kalamazoo*, 390 F.3d at 895).

The Magistrate Judge finds that the Plaintiff has not established that the guards used excessive force in returning him to his cell after he left it when the door to his cell was accidentally unlocked. As summarized above, there was adequate testimony which the Magistrate Judge credits, that the Plaintiff was not in notable distress prior to this time. The credible evidence shows that he attended his disciplinary hearing without

30

any noticeable difficulty in walking. He was clearly agitated at the disciplinary hearing and was returned to his cell.

The Magistrate Judge also credits the testimony of the various guards that, the Plaintiff upon leaving his cell, was concerned about returning to the Disciplinary Board, and not with problems with his back. When the Plaintiff was told that the Disciplinary Board was over and that he had to return to his cell, he sat down, then later lay down, refusing to return to his cell. The credible evidence also shows that the Plaintiff did, at a later point, complain about not receiving some medication that he was taking for his back strain that occurred in early September. However, the Magistrate Judge does not find that the Plaintiff was unable to move or return to this cell because of any problems associated with that earlier injury.

Although admittedly poor quality, the tape showing the Plaintiff moving from his cell in Delta pod to a new location does not support his claims of being in excruciating and debilitating pain (Ex. D-9). The Magistrate Judge credits the testimony of the State's witnesses that, following his placement in the cell, the Plaintiff did not exhibit serious medical problems. He was observed by LPN Breeden shortly after the use of force incident and was not observed to be in any acute distress at that time (Tr. 117-19).

Because of the Plaintiff's continued complaints about pain he subsequently was seen by Dr. Campbell, the prison's

31

physician. He continued with the treatment he was receiving before the incident, with muscle relaxers and pain medication, and when his condition did not improve he was provided an MRI and additional treatment. From Dr. Campbell's testimony and the medical records, it appears that the Plaintiff was suffering from back pain, which radiated into the lower part of his body before the incident and that those conditions continued. Because of the radiation of pain, Dr. Campbell did order an MRI, which did show spinal disc bulges at L3-L4 and L4-L5 regions.

The Magistrate Judge concludes that while the Plaintiff may have wished for different treatment, the four named Defendants in this matter were not deliberately indifferent to his medical needs. Following the incident, they reported the matter and the medical staff responded. Even if the medical staff was somehow negligent in the Plaintiff's treatment, they are not defendants in this matter and the Magistrate Judge is well satisfied that the four named Defendants adequately discharged their responsibility to the Plaintiff by having the medical staff come and check on the Plaintiff following his return to this cell.

The Plaintiff does not fare any better with his excessive force claim. Officials confronted with a prison disturbance must balance the threat that unrest poses to inmates and others against the harm inmates must suffer if the guards use force. Prison guards must make their decisions in haste, under pressure, and frequently without the luxury of a second chance. They are

entitled to wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *Griffin,* 604 F.3d at 954, quoting from *Combs v. Wilkinson,* 315 F.3d 548, 557 (6th Cir. 2002) and *Whitley*, 475 U.S. at 321.

In this case evidence shows that the Plaintiff was given numerous orders by increasingly senior officers to return to his cell and that he refused. The Magistrate Judge does not find from the evidence that the Plaintiff was incapable of returning to his cell on his own. Given the fact that the Plaintiff was outside his cell at a time the prison was conducting disciplinary hearings and moving inmates to and from their cells in the hearing, it was reasonable and necessary for the guards to ensure that the Plaintiff was in his cell.

The amount of force they used was reasonable. Four guards picked the Plaintiff up and returned him to his cell. The Magistrate Judge does not find any credible evidence that the Plaintiff was thrown or dropped during this action. The two inmates who testified for the Plaintiff were close associates of his and, in the Magistrate Judge's view, were quite likely to tailor their testimony to that of the Plaintiff. In particular, the Magistrate Judge credits the testimony of Corporal Jeremy Rubert that he overheard the Plaintiff and his witness inmate Ladd discussing possible rewards for his testimony in this case.

33

The Magistrate Judge has certainly considered the fact that prison guards may well on occasion tailor their testimony to protect their own interests. However, the Magistrate Judge found their overall testimony to be credible and reasonably consistent given the fact they were testifying about events two years earlier.

The Magistrate Judge finds that the actions of the guards in attempting to physically return the Plaintiff to his cell were reasonable and necessary under the circumstances. The Magistrate Judge does not find that they used excessive force with any intent to inflict serious injury on the Plaintiff.

As the Sixth Circuit noted in the *Griffin* case, even if the use of reasonable force produces a serious injury, such as a broken leg, the injury itself does not make the force used excessive. *Griffin,* 604 F.3d at 954.

The Magistrate Judge finds that the four guards who actually picked the Plaintiff up were Walters, Jenkins, Rubert and Dickson. McCarson did not pick up the Plaintiff. Lieutenant Dickson, who did, is not a named Defendant.

## CONCLUSION

The Magistrate Judge finds that the Plaintiff has failed to meet his burden of proof to establish that any of the Defendants used excessive force or were deliberately indifferent to his various medical needs.

34

## RECOMMENDATION

For the reasons stated above, the Magistrate Judge recommends that the Court find that the Plaintiff has failed to establish any of his claims in this matter by a preponderance of the proof. This case should be DISMISSED with prejudice with judgement for the Defendants.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has **14 days** from receipt of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have **14 days** from receipt of any objections filed in this Report in which to file any responses to said objections. Failure to file specific objections within **14 days** of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 106 S. Ct. 466, 88 L.Ed.2d 435 (1985), *Reh'g denied*, 474 U.S. 1111 (1986).

ENTERED this 8th day of January, 2013.


/s/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge

| WITNESS INDEX | | |
|---|---|---|
| **PLAINTIFF'S WITNESSES** | | |
| Orlando Ladd | | 5 |
| | | |
| Carl Talley | | 6 |
| | | |
| LaQuenza M. Lilly | | 7 |
| | | |
| **DEFENDANTS' WITNESSES** | | |
| Jack E. Middleton | | 9 |
| | | |
| Cathy McCarson | | 11 |
| | | |
| James Walters | | 14 |
| | | |
| Jeremy Rubert | | 16 |
| | | |
| David Lee Jenkins | | 18 |
| | | |
| CPL Kory Godwin | | 20 |
| | | |
| Barbara Breeden | | 21 |
| | | |
| Jessica Blankenship | | 22 |
| | | |
| Dr. Otis Campbell | | 23 |
| | | |
| Jerry Dickson | | 26 |
| | | |